## Case No. 5,847. ·

### GROVER & BAKER SEWING MACH. CO. v. WILLIAMS et al.

[2 Fish. Pat. Cas. 133.] 1

District Court, D. Massachusetts. Dec., 1860.

PATENTS—PRELIMINARY INJUNCTION—PRIMA FACIE CASE—PRIOR SUITS AND JUDGMENTS—REISSUE.

1. On the hearing of a motion for a preliminary injunction, it is not sufficient for a plaintiff, in order to make out a prima facie case, merely to produce his patent.

2. The prima facie right under the patent must be strengthened, in one of two ways, by a judgment or decree after a judicial investigation; or by exclusive possession for some time, or, in other words, by the acquiescence of the public in the claim which is set up, under the patent, to a monopoly.

[Cited in Dickerson v. De La Vergne Refrigerating Mach. Co., 35 Fed. 144; Corbin Cabinet Lock Co. v. Yale & Towne Manuf'g Co., 58 Fed. 564.]

[Cited in Carpenter v. Dick, 41 Ohio St. 294.]

ó. Where an injunction is sought upon the ground that suits have been brought upon the patent and judgment obtained without resistance, and it appears that several patents were sued upon in the same action, that fact must diminish the force of the presumption that the defendant submitted because of his belief of the validity of the patent, to restrain the infringement of which the injunction is sought.

[Cited in McWilliams Manuf'g Co. v. Blundell, 11 Fed. 422.]

4. It would not necessarily follow, because there were certain persons carrying on an art or manufacture at their own manufacturing establishment, and others did not enter into competition with them, that that abstaining from competition was owing to the belief that they had the exclusive right.

5. If a prejudice existed against the use of the patented article, it could not be until the patentee had succeeded by the expenditure of time, labor, and money in overcoming that prejudice, and introducing the article into general demand, that others would feel a desire to participate in the manufacture.

6. If the manufacturer held several patents under which he was claiming an exclusive right, the fact that the public abstained from interfering with his monopoly, would not prove that they supposed them all to be equally valid, or enforce a presumption, from that source, of the validity of any particular one of them.

7. If one of those patents had already been sustained, and the plaintiff was entrenched behind it, it could hardly be said that the public abstained from making his machine because they believed in the validity of other patents held by him.

8. Undoubtedly there may be cases in which an original patent relates to and covers palpably the same thing that is in the reissued patent; and if it does, and the public have acquiesced in the claim made in the original patent, it is evidence to show that they believe that the patentee had an exclusive right to it.

9. But, if the original patent did not claim the same thing as the reissue, and therefore the public had no notice that it was the patented invention, or that the patentee claimed it, or had any exclusive right to it, then the acquiescence in the original patent can not be construed as acquiescence in the reissue.

---

1 [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.]

This was a motion [by the Grover & Baker Sewing Machine Company against Charles W. Williams and others] for a provisional injunction to restrain the infringement of letters patent [No. 7,931], for an improvement in sewing machines granted to William O. Grover and William E. Baker, February 11, 1851, reissued June 15, 1858 [No. 568], and assigned to complainants. The claims of the reissued patent were as follows: "First. A mechanism for making a stitch substantially such as is described, and consisting of an eye-pointed perforating instrument and a non-perforating eye-pointed instrument, operating substantially as specified. Second. A stationary table or support for the material to be sewed, substantially such as specified, and performing the duties, substantially as set forth; and, Third. A feed, in which the cloth is grasped between two surfaces without being attached to either of them, substantially in the manner and for the purpose set forth; meaning to claim as of our invention none of these elements severally or apart from the others, but only the three in combination." The facts upon which the injunction was asked and denied are sufficiently set forth in the opinion.

S. J. Gordon, Causten Browne, and G. T. Curtis. for complainants.

A. C. Washburne, for defendants.

SPRAGUE, District Judge. This is a motion for a preliminary injunction to restrain the defendants from making a certain kind of sewing machine, to which the plaintiffs claim the exclusive right by virtue of a patent. This motion is heard in a summary way upon ex parte affidavits, which is not the most satisfactory mode of investigating the rights of parties when in contestation. A summary hearing is had upon a necessity more or less urgent, for the immediate interposition of the court; and it is presumed that there is not time for that full and thorough investigation which is to be made upon the final hearing, where the witnesses can be subjected to a cross-examination, and the process of the court may be used to compel the attendance of the witnesses and the production of evidence. In such a hearing, it is not sufficient for a plaintiff, in order to make out a prima facie case, merely to produce his patent. The court will not, upon the mere production of a patent, entertain this motion for a preliminary injunction.

The prima facie right under the patent must be strengthened; and that is done in one of two ways: by a judgment or decree after a judicial investigation; or by exclusive possession for some time, or, in other words, by the acquiescence of the public in the claims which the plaintiff has set up under his patent to a monopoly. In this instance there has been no judicial investigation. There have been cases—one in this court, at law, and three cases in Pennsylva-

nia, in equity, in which the defendants have, by an arrangement with the plaintiffs, submitted, and a judgment and decree have been given against them—which I may, perhaps, advert to hereafter; but no case has been presented where the judicial mind has been called to the investigation of this subject, and to determine upon such investigation, the validity or invalidity of the plaintiffs' claim. The plaintiffs therefore, rely mainly at least —or I might say, in the view which I take of it, entirely—upon exclusive possession-acquiescence by the public in the claim set up under this patent: and we are called upon, therefore, to examine with some care the evidence of such acquiescence.

Acquiescence is taken as evidence of the plaintiffs' right, and may in some cases in a great degree strengthen the presumption created by the patent itself. If a party set up an exclusive right to the manufacture and use of an article which others are desirous of manufacturing or using, and it would manifestly be for their interest to do so, and they would do so, did they not think themselves prohibited by the patent right of another; then, their acquiescence, their abstaining from making that which it is morally certain they would do, but for such patent, shows the conviction of those who are interested adversely to it—and who, from being interested in it, may be presumed to have knowledge on the subject—shows that they are convinced of the patentee's right, and that they have sacrificed their interest to that conviction. But if there be no adverse interest, no person, who would be desirous of using it, whether it were patented or not, then their not using it can not afford a presumption of the right, and would not strengthen it.

In the present case, I do not understand that it is alleged that there has been an acquiescence since the issue of 1858. On the contrary, the evidence furnished by the complainants themselves, and particularly by Mr. Potter's affidavit, shows very clearly and very strongly, I think, that there has been no acquiescence since that reissue. That reissue is dated June, 1858. Mr. Potter says that since that time, up to the date when he gave his affidavit, violations had been very numerous; that he had before him thirty circulars of persons who make and manufacture these machines; and he adds further, that not one in fifty of these manufacturers has pecuniary ability to respond; and that, in fact, the country is flooded with spurious machines greatly to the injury of the plaintiffs. He says that these violations began in the summer of 1858, the patent was granted in June, 1858, and I did not understand the learned counsel who closed this case—or, in fact, either of the counsel for the plaintiffs —as relying at all upon any exclusive possession or acquiescence under the reissued patent.

The suits to which I have referred were brought under that reissued patent, the suit at law in this court, and the three suits in equity in Pennsylvania, and the evidence is that those persons submitted to the reissued patent, and the claim that was in it, and that, under some arrangement or settlement that was made between the parties, judgment was rendered here, and decrees were rendered in Pennsylvania. Those suits were entered, I believe, in the October term, 1858. Now, submission in three cases out of numerous cases of infringement, can not snow a general acquiescence under the reissue, even if those suits had been founded upon the reissued patent alone, though they were not; and the fact that those suits were founded upon other patents must diminish the force of the submission to this patent, because in the agreement that the judgment should be entered and the decrees rendered, there is no distinction made between patents.

It is not said that it was on account of this patent that judgment was submitted to. Now, in the suit at law here, there were three other patents counted upon; and it may have been any one of these patents that was really the cause of the parties submitting, or it may have been more than one, or it may have been all; we do not know which. So in Pennsylvania. In two of the suits, I think, there were two other patents, and in the remaining suit one other patent, besides this, to which the same observations may apply. I can not consider, therefore, that there is any such evidence of exclusive possession or acquiescence under the reissued patent, as can be said to strengthen the presumption of right in the plaintiffs to that patent. It would seem rather the contrary—that it has been contested and disputed, practically, by numerous persons making the machine from the time almost of that reissue.

The plaintiffs, then, must rely, as they do rely, upon acquiescence under the original patent, which was granted on February 11, 1851, and it becomes necessary for the court, therefore, to examine the evidence applicable to that period of time.

Now, it is to be remarked, that the plaintiffs claim here an acquiescence by the public in refraining from manufacturing the Grover & Baker Sewing Machine. It is not acquiescence by taking licenses from them, and paying them a sum of money; that has not been their course. They have neither licensed nor offered to license, as I understand, but have their own manufacturing establishment, where they manufacture machines under their patents and others. From 1851 to 1858, others did not interfere—did not manufacture the articles; and it is upon this abstinence that the plaintiffs rely as giving exclusive possession—and showing general—I may say universal—acquiescence, on the part of the public in their claims. Now, the strength of that acquiescence, in the first place, it is to be observed, depends upon what would be the apparent interest of the public to manufacture if the plaintiffs had not the exclusive right

which they claim. If they had paid for licenses, that would be a palpable and manifest sacrifice of their interests to their conviction of the plaintiffs' right, because it shows a desire to make the machine, and abstaining from it, paying the plaintiffs. and thus making a pecuniary sacrifice for the sake of getting the right from the plaintiffs. But it would not necessarily follow, because there were certain persons carrying on an art or manufacture at their own manufacturing establishment, and others did not enter into competition with them, that that abstaining from competition was owing to the belief that they had the exclusive right. It may be so, and it may not be. Persons set up the manufacture of a new article: others may not enter into competition, because they do not believe it for their interest; they may not believe it to be profitable; and in that case, there would be no evidence that they believed they were excluded from it by a monopoly in possession of those persons.

In the present case, Mr. Potter testifies that he came in as a partner in the concern of Grover & Baker in 1852. It seems, by his statement, that they began the manufacture of these machines shortly before the issue of that patent. The manufacture commenced in 1850; the patent was issued in February, 1851; he became a partner in 1852; and speaking, therefore, of what he knew as a partner, he says there was a prejudice against this machine which it required labor, time, and expense to overcome, before it could be introduced. While that prejudice existed, and it was not introduced as an article of demand to the public, it could hardly be supposed that others would feel the temptation of interest to enter into competition with them in the manufacture. It would not be until they had succeeded by the expenditure of labor, and time and money in overcoming that prejudice, and introducing it as an article of general demand that others would feel a desire to participate in the manufacture. When that time was reached is not stated in the affidavit, and therefore we can not say. So far, it goes to show that there was a period when it can not be readily supposed that others abstained from manufacturing merely from apprehension that the plaintiffs had an exclusive right, because they might then well suppose it would not be a profitable undertaking.

But, then, coming to the position which the plaintiffs hold, under what exclusive right did they carry on this manufacture? In the first place, they had this patent of 1851. They then had a patent granted to themselves for the circular needle to be used in their machines in 1852. They held another patent for the mechanism for making the stitch, granted to William G. Bates originally, which bore date February, 1853, and was purchased by them at that time, or, it is said, taken out by Bates in trust for them. They had, also, the Fitzgerald patent, which issued I believe in 1854.

They held those patents. Those were patents under which the plaintiffs were proceeding to manufacture their sewing machines, claiming the exclusive right under those patents, and under all of those patents. The public abstained from making that machine, and it is said that they abstained because they believed in the exclusive right of the plaintiffs under the patent of 1851. But if they had an exclusive right under either of the other patents, valid under the law, the public were barred effectually by· the law from making this sewing machine; because one valid patent is as effectual a barrier in law as four, covering the same thing, to prevent another person's making it: that is, it would be a wrong, a violation of law, subjecting them to damages, and subjecting them to be stopped by an injunction of the court. Now, if they abstained from making it because they believed·the plaintiffs had an exclusive right to that manufacture, yet there is nothing here to show whether they believed that the exclusive right was because of one of those patents, or all of them, or more than one, and, if of one, of which? How can it be said, then, that it is shown by the plaintiffs that the public abstained from making it because they believed in the validity of the patent of 1851, when, if they believed in the validity of the patent of 1852, or 1853, or 1854, they were equally prevented from interfering with the plaintiffs' manufacture? The most that can be said, is, that they may have abstained from their apprehension of the patent of 1851, or they may not. They may have abstained from their apprehension of the validity of either of the other patents. Now, it is incumbent upon the plaintiffs affirmatively to show that their acquiescence was under the patent of 1851; and when they show that they acquiesced either under that or under some one or all of the three others, it can hardly be said that they have affirmatively shown that they acquiesced in the patent of 1851. That difficulty, I think, exists in relation to these patents.

Thus far I have put these patents upon the same ground. as if they presented to the public an equal bar against their entering into this business. I think, however, that is presenting it rather stronger for the plaintiffs than the testimony would warrant. It appears from the plate that was produced by the plaintiffs, that these four patents—as also Mr. Howe's patent, to which I·shall advert hereafter—are engraved on each of these machines, as the patents under which it is made. If the public interested in ascertaining what was the extent of the plaintiffs' right, had gone to the proper source of information, the patent office at Washington, to learn whether any or all of those patents were valid, and whether, therefore, they were excluded by law from entering into competition with them in this manufacture; they would have found that in 1852, the patentees surrendered this patent of 1851, and made a

declaration in writing that it was inoperative, for defects and applied for a reissue for that cause. They would have found, that while that application for a reissue was pending, William H. Johnson made application for a patent for the same thing, and thereupon an interference was declared, a trial had, a decision rendered in favor of Johnson, a patent granted upon his application in the name of Bates, and the plaintiffs' application for a reissue denied. That would all appear by the records of the patent office, and it would further appear that, upon application of the plaintiffs, their patent of 1851 was returned to them; and in that condition the records stand and the facts remain until 1858. If, therefore, any time between the period when that surrender was made, and 1858, a party had gone to the patent office, he would have found, as to this particular patent, a written declaration by the patentee himself that it was inoperative, and application for a reissue refused, and that, after the trial for an interference, a patent for the same thing for which they asked a reissue was granted to another person, the plaintiffs taking that by assignment to them and afterward going on under that patent, claiming it as valid. I think, therefore, that there being nothing on the files of the patent office, or elsewhere, so far as we know, up to 1856, to invalidate the other patents, if the public had investigated the matter, they could hardly have supposed that the barrier was as great from that patent of 1851, as from either of the other patents, because the patentee had declared that to be inoperative and desired a reissue, and that is not proved of either of the other patents. It was weaker, then, as a protection than either of the other patents, as it would have appeared, I think, to any person, who was investigating the claims of the patentee. Nothing has been shown here to invalidate the patent of 1852 for the circular needle, or the Fitzgerald patent of 1854—nothing to show that they are not valid patents.

The patent for the particular stitch—the Grover & Baker stitch—for which they asked a reissue, and for which Johnson obtained a patent, which they purchased, was believed to be valid in this country until 1856. It was then found that there had been a prior patent for the mechanism of that stitch granted to Fisher & Gibbons in England, some years before. But Johnson, the inventor of the mechanism of this stitch, and who says that he had been in the business of inventing and investigating machines, and especially sewing machines, and machinery for years; Johnson says that he never heard of Fisher & Gibbons, or any one that would interfere with his claim, until 1856; and there is no evidence that anybody had heard of it in this country before. Therefore, up to that time, there is no evidence but that everybody thought that patent was valid, and might well exclude everybody from going into the manufacture of this article. After that time the patent for the feed granted to Fitzgerald, as well as the circular needle, was supposed to be valid: And are now supposed to be valid. At any rate, there is nothing in this case to create any doubt of it. There would, therefore, be less presumption, perhaps, of acquiescence in the patent of 1851, than in respect to either of the other patents that the plaintiffs hold, for the reasons that I have stated.

But the difficulty the plaintiffs have to encounter does not stop here. In addition to these patents they have a license from Mr. Howe, and that also is put upon the plate which is attached to each of these machines, as information to the public that they manufacture under that; and by the contract with Mr. Howe, to whom the plaintiffs have paid large sums of money—over $100,000 for the benefit of the contract or obligation that Howe entered into with them—by that contract with Howe, he was bound not to license anybody under his patents who was infringing any of the patents held by the plaintiffs (I understand that to have been one of the covenants in the agreement); and further, that he would prosecute persons who should infringe his (Howe's) patent, when such infringement was prejudicial to the plaintiffs. Upon that obligation they relied, and as they set forth have invoked the aid of Mr. Howe, instituted a suit which was heard upon an application for a preliminary injunction in March, and the fact that Howe, for their protection, as I understand, was proceeding in that suit is assigned as a reason why these plaintiffs should not earlier commence this bill in equity. They had then the protection of this overshadowing patent of Howe, covering so large a proportion of the sewing machines now in use—they had that protection against infringers upon their manufacture, and no person could make one of the Grover & Baker machines, as it is stated, I think, in the affidavit of Potter, or in the bill, without violating the Howe patent. They paid to Howe large sums of money to authorize them to make it. It stood thus, then, that no man could make the article they were manufacturing without violating the Howe patent, and if any one did make an article in violation of any one of their patents, Howe was bound to prosecute him under his patent; bound not only to refuse to license but to prosecute. If, therefore, the public did not believe that any one of the patents held by the plaintiffs was valid, if they believed that Howe's was valid, and if they believed what the plaintiffs assert to be true, that they could not make the Grover & Baker machine without violating the Howe patent, they could not enter into competition; they were effectually excluded by the validity of the Howe patent when they could not make machines without violating that patent; and the plaintiffs being entrenched behind the Howe patent, it can hardly be said that the public ab-

stained from making their machine because they believed in the validity of any of the patents which the plaintiffs had, for they may have abstained because they were afraid of interfering with Howe's patent. Much less can it be said that they abstained because they believed in the validity of the patent of 1851. I think, therefore, that taking all this evidence into view, of the actual position which the plaintiffs held, it would be difficult to say that the plaintiffs' patent is materially strengthened by any proofs of exclusive possession, even if the original patent had set forth exactly the claim which is now set forth in the reissued patent.

But it is contended by the respondent's counsel, that the original patent does not secure to the plaintiffs that which is described in the reissued patent: that the original patent was for the mechanism for making the stitch; that the reissued patent is for a combination of the three elements in the sewing machine which, for brevity's sake, I will say, are: the mechanism for feeding the cloth, the mechanism for making the stitch, the mechanism for feeding the cloth (the feed), and the table or platform; and it is contended by the respondent that the combination, and only that combination, is secured to the plaintiffs by the reissued patents; whereas, by the original patent, it was only an element of that combination that was secured to the plaintiffs.

This construction, however, is controverted by the plaintiffs' counsel who insist that the original patent embraced the combinations claimed in the reissue. This question I have no occasion to decide. But the existence of such a question of construction has some weight against this motion. If the view taken by the respondent's counsel is correct, then, if the plaintiffs had held only the original patent of 1851, and had had no protection from the Howe patent, and none of the other difficulties were in their way that I have named, the most that it can be presumed the public acquiesced in was the claim that the plaintiffs had set up, and was secured to them by their patent, that is, to the mechanism for making the Grover & Baker stitch.

With respect to the case of Orr v. Badger [Case No. 10,587], which has been cited here, that only goes to this extent, that there may be cases in which acquiescence in the original patent is evidence of acquiescence in the reissued patent, and that that was one of these cases. That is the whole extent, I think, of that authority. In that case, the court says: "In this case, the evidence of acquiescence, under the original patent, is evidence of acquiescence under the reissue." What the circumstances of that case were are not detailed in the report, and we are not, therefore, able to say what the facts were upon which the court acted in giving that decision. Who made that report I do not know, but he has not gone into a full statement of the facts. Undoubtedly there may be cases in which the original patent relates to and covers probably the same thing that is in the reissued patent; and if it does, and the public have acquiesced in the claim made in the original patent for the same thing that is claimed in the reissued patent, it is evidence to show that they believe that the patentee had an exclusive right to it. But if the original patent did not claim the same thing, and, therefore, the public had no notice that it was the patentee's invention, and, if it was his invention, had no notice that he claimed it—or, at all events, that he had any exclusive right to it—then the acquiescence in the original patent can not be construed as acquiescence in that which he did not then claim, but which sometime afterward he did.

Now, as to this combination—assume that it was set forth in the original patent, and assume that it was so set forth that the party might have claimed it if he had seen fit, still it was by no means clear that he claimed it; apparently his patent did not cover it, and, therefore, the public can not be said to have abstained from it.

Under these circumstances, I think it can not be said that the court is called upon, under the general rules which govern this class of inquiries—summary inquiries—to go into the merits of the case, and certainly not to grant an injunction, if, upon the merits there are substantial doubts either as to the validity of the plaintiffs' right, or as to the alleged infringement by the defendants. And I can not but entertain such doubts. Various questions have been raised. In their answer, the defendants deny that they infringe—they deny that the plaintiffs are assignees of the patent of 1851. In the next place, they deny that if they were the assignees the patent was valid, and this upon several grounds: 1st. That the patentees were not the first inventors. 2d. That if they were the first inventors, they have not made such a description of their invention as will enable one skilled in the art to manufacture an operative machine. 3d. That they surrendered their patent in 1852, and that from 1851 to 1858 they did not claim what they now claim; during all which time they were making the sewing machine—and the defendants contend that that is an abandonment to the public, and that the question of abandonment is one for a jury. Some of these points, I think, are by no means free from doubt and difficulty. I can not but have some impressions respecting them, but I abstain from the expression of any views I may entertain, because there will doubtless be a future and final hearing, either at law or in equity, of all the questions involved. The motion for injunction must be denied.

GROVERMAN (DARLINGTON v.). See Case No. 3,576.

GROVERMAN (WISE v.). See Case No. 17,-910.